IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CANDELARIA TORREZ,

     Plaintiff,

     vs.                                        Civ. No. 19-740 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff Candelaria Torrez's ("Ms. Torrez") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21) ("Motion"), filed March 19, 2020, seeking review of the unfavorable decision on her claim for Title XVI supplemental security income ("SSI") under 42 U.S.C. §§ 405(g) and 1383(c)(3). Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), filed a response in opposition to the Motion on June 17, 2020, (Doc. 25), and Ms. Torrez filed a reply in support of the Motion on July 8, 2020. (Doc. 28.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Ms. Torrez's Motion is well taken and should be **GRANTED**.

## I.     Background

Ms. Torrez is a thirty-four-year-old single mother of one who lives with her parents in Yahtahey, New Mexico. (Administrative Record ("AR"[2]) 077, 243-44.) Her past work history

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 10.)

[2] Citations to "AR" are to the Administrative Record (Doc. 16) that was lodged with the Court on December 12, 2019.

includes movie theater concessioner, cashier, substitute teacher, and part-time home healthcare worker. (AR 073-75.) In 2006, she was diagnosed with post-traumatic stress disorder ("PTSD"). (AR 1163.) Since that time, she has been under the care of psychiatrist Richard Laughter, M.D., who has also diagnosed Ms. Torrez with and treated her for bipolar I disorder and anxiety. (AR 1163-64.)

Ms. Torrez filed an application for SSI on August 28, 2015, alleging a disability onset date of August 8, 2015 due to bipolar disorder, PTSD, and anxiety. (AR 104-05.) Her application was denied initially in March 2016 (AR 105-12), and again at reconsideration in August 2016 (AR 113-24). Ms. Torrez requested a hearing before an Administrative Law Judge ("ALJ") (AR 126), and ALJ Ann Farris held a hearing on June 19, 2018. (AR 068-103.) The ALJ took testimony from Ms. Torrez (AR 073-90), Ms. Torrez's friend and former co-worker Melissa Howard (AR 091-96), and impartial vocational expert ("VE") Mary Diane Weber (AR 096-101). On October 29, 2018, the ALJ issued an unfavorable decision finding that Ms. Torrez has not been under a disability since the date of her application. (AR 039-55.) Ms. Torrez sought review by the Appeals Council and submitted additional evidence, which the Appeals Council declined to exhibit, finding that it "does not show a reasonable probability that it would change the outcome of the decision." (AR 002, 014-33, 242.) Following the Appeals Council's denial of her request for review (AR 001-6), Ms. Torrez appealed to this Court. (Doc. 1.)

## II.   <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In undertaking its review, the Court must meticulously examine the

entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2006). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *id.*, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III.   <u>Discussion</u>

Ms. Torrez raises three points of error: (1) in assessing Ms. Torrez's residual functional capacity ("RFC"), the ALJ improperly rejected the opinion of her treating psychiatrist, Richard Laughter, M.D. (Doc. 21 at 14-20); (2) the RFC the ALJ assessed is not supported by substantial evidence (Doc. 21 at 21-24); and (3) the Appeals Council erred by declining to consider the additional evidence she submitted (Doc. 21 at 9-14). The Commissioner argues that the record supports the ALJ's accordance of "little weight" to Dr. Laughter's opinions (Doc. 25 at 15-19),

that the RFC the ALJ assessed is supported by substantial evidence (Doc. 25 at 13, 19-20), and that the Appeals Council properly declined to consider the additional evidence Ms. Torrez submitted (Doc. 25 at 6-13). For the following reasons, the Court concludes that the ALJ committed reversible error in her consideration of Dr. Laughter's opinion, which inherently infected her assessment of Ms. Torrez's RFC. Reversal and remand for further proceedings is therefore required.

**A. Ms. Torrez's Relevant Medical History**

Ms. Torrez has been under the care of Dr. Richard Laughter, a medical doctor with a specialization in psychiatry, since 2006. (AR 1163, 1373, 1376.) In 2006, she was in a motor vehicle accident to which Dr. Laughter attributes the onset of her PTSD, which is also related to physical abuse she suffered as a child and other traumatic events in her younger adulthood. (AR 1163, 1383-84.) From 2006-2013, Ms. Torrez's treatment for PTSD, bipolar disorder, and anxiety was "off and on" and included the use of prescription medications (Depakote, Librium, and Zoloft) as well as medical cannabis. (AR 1163.) The earliest medical treatment record contained in the administrative record dates from January 18, 2013. (AR 1163.) That record indicates that Dr. Laughter continued Ms. Torrez on Depakote, Librium, and Zoloft and approved the renewal of her medical cannabis license at that time. (AR 1163-64.) Ms. Torrez did not see Dr. Laughter again until March 2014, at which time she reported being fifteen weeks pregnant. (AR 1156.) Due to her pregnancy, her psychotropic medications were discontinued, although Dr. Laughter agreed to approve her medical cannabis license renewal with instructions not to use it until after giving birth. (*Id.*; *see* AR 1150.) Ms. Torrez saw Dr. Laughter again in August 2014 for psychotherapeutic counseling to address Ms. Torrez's concerns about the impending birth of her first child and the possibility of postpartum depression given that she had not been on medications for several

months. (AR 1150, 1155.) Dr. Laughter noted that Ms. Torrez's symptoms were "mild to moderate" with "[n]o acute symptoms" and advised her to "continue frequent follow-up." (*Id.*) In December 2014, Ms. Torrez reported "doing okay" but having "ups and downs." (AR 1143 (quotation marks omitted).) Dr. Laughter noted that she "has signs and symptoms of depression but doesn't want medications at this point because she is breast-feeding." (*Id.*)

Ms. Torrez continued seeing Dr. Laughter regularly throughout 2015 and 2016, during which time she declined medications because she was breastfeeding. (AR 1167, 1172, 1177, 1182, 1187, 1192, 1198, 1203, 1208, 1213, 1218, 1223.) She continued receiving psychotherapeutic counseling to manage her ongoing symptoms, that included feelings of isolation, variable energy levels, problems with concentration, and mood instability, as well as racing thoughts, poor sleep, nightmares, flashbacks, reaction to triggers, hypervigilance, and generalized anxiety. (*See* AR 1167-68, 1172-73, 1177-78, 1182-83, 1187-88, 1192-93, 1198-99, 1203-04, 1208-09, 1213-14, 1218-19, 1223-24.) In May 2016, Ms. Torrez indicated that she wanted to restart Depakote and Zoloft once she was done breastfeeding. (AR 1218.) In early June 2016, she reported that her "mood is within normal limit of her problems" and that she "desires no changes[,]" but also that, at times, she "wants to restart psychotropic aids for bipolar symptoms." (AR 1223.)

On June 28, 2016, Ms. Torrez agreed to restart medication to help manage her symptoms. (AR 1228.) For the next several months, Dr. Laughter, who indicated that Ms. Torrez is "very sensitive to medications" (AR 1384), modified and titrated Ms. Torrez's medication regimen in response to her symptoms and reported side effects. (AR 1228, 1233, 1239.) He also continued to provide psychotherapeutic counseling at her monthly treatment sessions. (*See* AR 1250, 1256, 1261, 1266, 1271, 1276, 1281, 1286, 1291, 1295, 1310, 1320, 1325.) Although Dr. Laughter prescribed twice daily use of both lithium and Klonopin, Ms. Torrez reported that she was using

them only on an as-needed basis throughout 2017 because she continued to breastfeed. (AR 1283, 1288, 1293, 1297.) Starting in December 2017 and continuing into early 2018, Dr. Laughter again modified and titrated Ms. Torrez's medications when she complained of side effects. (AR 1302, 1307, 1322.) In mid-January 2018, Ms. Torrez indicated that she was still taking her medications only on an as-needed basis because she continued to breastfeed. (AR 1307.) However, when Ms. Torrez presented as a walk-in patient in late January complaining of mood instability and anxiety, as well as side effects from her lithium, she agreed to start taking a new medication twice a day. (AR 1312.) Between February and April 2018, she gradually increased her dosage of her mood stabilizers in accordance with what Dr. Laughter prescribed. (AR 1318, 1323, 1332.) In May 2018, Dr. Laughter indicated that even after the recent adjustments and with medication adherence, Ms. Torrez "remains very symptomatic." (AR 1379.)

**B. Dr. Laughter's Medical Opinions and Deposition Testimony**

In December 2017, Dr. Laughter completed forms, provided by Ms. Torrez's attorney, in which he rendered findings regarding the severity and extent of Ms. Torrez's mental impairments and her resulting mental limitations. (AR 783-84.) He indicated, *inter alia*, that Ms. Torrez has *marked* restrictions in her activities of daily living, *marked* difficulties maintaining social functioning, *marked* difficulties maintaining the ability to concentrate, persist, or keep pace, and repeated episodes of decompensation. (AR 783, 784.)

In January 2018, Dr. Laughter completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which he rated the severity of Ms. Torrez's mental limitations in twenty different work-related activities. (AR 1085-86.) He found her to have a *marked* limitation in eleven of the twenty activities and a *moderate* limitation in the other nine. (*Id.*) Specifically, he assessed *marked* limitations in the following areas: (1) understand and remember detailed

6

instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods of time (i.e., 2-hour segments), (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, (5) work in coordination with/or proximity to others without being distracted by them, (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (7) interact appropriate with the public, (8) accept instructions and respond appropriately to feedback from supervisors, (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (11) set realistic goals or make plans independently of others. (*Id.*) And he assessed *moderate* limitations in Ms. Torrez's ability to: (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, (3) carry out very short and simple instructions, (4) sustain an ordinary routine without special supervision, (5) make simple work-related decisions, (6) ask simple questions or request assistance, (7) respond appropriately to changes in the work place, (8) be aware of normal hazards and take adequate precautions, and (9) travel in unfamiliar places or use public transportation. (*Id.*) In the "Comments" section of the form, Dr. Laughter wrote: "Bipolar: mood instability, racing thoughts, poor concentration, problems completing projects, poor sleep. PTSD: mood instability, nightmares, flashbacks, reaction to triggers, avoids triggers, hyper-vigilant." (AR 1085.)

When he was deposed by Ms. Torrez's attorney in May 2018, Dr. Laughter testified that since graduating from medical school in 2002 and completing his residency in psychiatry in 2006, he has seen approximately 5,000 patients at the clinics he has worked at and now runs in Gallup and Grants, New Mexico. (AR 1373-74.) Regarding Ms. Torrez, he explained that he has been

treating her for around twelve years and knows "all of her patterns" and "all the medications she's been on." (AR 1376-77.) His treatment notes indicate that he regularly counseled her regarding recurrent life stressors, such as her estranged relationship with her daughter's father and trying to get child support from him, being a single mother, financial instability, and wanting to move out of her parents' house and live independently. (AR 1093, 1096, 1117, 1141-42, 1132, 1148.) He also repeatedly noted that Ms. Torrez expressed a desire to work but reported having a "poor work history" due to "temper problems" and being "unable to keep a schedule, take directions from her boss, interact with coworkers, and interact with the public." (AR 1093, 1106, 1122, 1137, 1148, 1212.) In August 2017 when Ms. Torrez reported that she was fired from a job after less than two weeks, Dr. Laughter counseled her regarding how her bipolar disorder can affect her ability to work. (AR 1093, 1096; *see* AR 1379.)

At his deposition, Dr. Laughter opined that based on Ms. Torrez's history and his experience with her, the "main reason" she has been unable to keep a job is her "mood instability" due to bipolar disorder combined with PTSD. (AR 1379.) He explained, "the pressures of working and being on schedule, pressure[s of] dealing and interacting with clientele, pressure[s] of dealing with employees, pressures of dealing with supervisors, it[']s going to knock her off track sooner than later. Maybe once or twice a day." (AR 1379.) He further stated that "with a person with severe PTSD as her, there's a likelihood of physical altercations" and/or verbal altercations whenever "[s]omething throws her off, whether it's a trigger, whether it's a flashback or something like that." (AR 1379, 1383.) Dr. Laughter described Ms. Torrez's bipolar disorder and PTSD as "permanent" conditions for which symptoms will "wax[] and wane[], from acute to stable" and explained that the goal of treatment is to "reduce the symptoms" through use of medication and counseling. (AR 1384.) He explained that in the ten-to-twelve years he has known Ms. Torrez,

however, she had been able to live independently for only a few months and otherwise "always lived at home[,]" she has "never kept a job[,]" and she has "never been stable for long periods of time." (AR 1379, 1383.) He further noted that even when Ms. Torrez is taking all her medications, including in the immediately preceding 4-5 months, she "remains very symptomatic." (AR 1379, 1384.) Asked whether he wanted to make any changes to his findings in the functional assessments he had completed, he responded, "[N]o. She's unstable." (AR 1384.)

### C. The ALJ's Decision

The ALJ found at step one of the sequential evaluation process that Ms. Torrez has not engaged in substantial gainful activity since her application date of August 28, 2015. (AR 044.) At step two, the ALJ found that Ms. Torrez has the severe impairments of bipolar I disorder, PTSD, and anxiety. (*Id.*) At step three, the ALJ found that the severity of Ms. Torrez's impairments, considered singly or in combination, does not meet or medically equal the severity of any listings, specifically Listing Sections 12.04 (Depressive, bipolar, and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and/or 12.15 (Trauma and stressor-related disorders). (AR 045-47.) She found that Ms. Torrez has only a *moderate* limitation in each of the four broad functional areas used to evaluate mental impairments: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. (AR 046-47.)

In proceeding to assess Ms. Torrez's RFC, the ALJ concluded that Ms. Torrez

has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant should have no interaction with the general public and only occasional and superficial interactions with co-workers; and the claimant should not be required to work at a production-rate pace or to perform tandem tasks.

9

(AR 047.) In discussing the medical opinion evidence as it related to the RFC she assessed, the ALJ accorded "little weight" to the opinions of the State agency psychological consultants who reviewed Ms. Torrez's application at the initial and reconsideration levels and found that Ms. Torrez's mental impairments were "non-severe." (AR 048.) Regarding the opinion of consultative psychological examiner Carl B. Adams, Ph.D., who examined Ms. Torrez in February 2016 and found her to have "no limitations" in any of the four broad areas of mental functioning (*see* AR 515-16), the ALJ accorded it "moderate weight," finding it to be "consistent with and supported by his mental status examination," although "not entirely consistent with the claimant's mental health treatment records and the claimant's own statements showing some mood instability." (AR 048-49.) Regarding Dr. Laughter's opinions, the ALJ gave them "little weight" because she found them to be "not consistent with or supported by the record as a whole," including (1) Dr. Laughter's treatment records, (2) Ms. Torrez's "non-compliance with mental health treatment (including failure to pursue psychotherapy)," (3) Ms. Torrez's "good response to medication and therapy when she is compliant," and (4) Ms. Torrez's daily activities, "including the ability to care for her child and her parents." (AR 050.)

Although the ALJ found at step four that Ms. Torrez would be unable to perform any past relevant work, she concluded at step five that considering Ms. Torrez's age, education, work experience, and RFC, Ms. Torrez "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR 053-55.) Specifically, based on the testimony of VE Weber, the ALJ found that Ms. Torrez would be able to perform the requirements of the following representative occupations: shelving clerk (library), routing clerk, and dishwasher. (AR 054.) She therefore found that Ms. Torrez is "not disabled." (AR 055.)

**D. The ALJ's decision fails to evince application of the correct legal standards for weighing Dr. Laughter's opinions.**

10

### 1.  **Applicable Law**

The ALJ's decision must demonstrate application of the correct legal standards, and failure to follow the "specific rules of law . . . in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988). Regarding medical opinion evidence, the ALJ must consider all medical opinions of record and is required to discuss the weight she assigns to each opinion. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)(ii)). Generally, the ALJ should accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 416.927(c)(1); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Treating source[3] medical opinions are entitled to—and, in fact, *must* be given—controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2); *see* SSR 96-2p, 1996 WL 374188, at * 1 (July 2, 1996)[4] (identifying the four factors that determine whether an opinion is entitled to controlling weight as (1) the opinion comes from a "treating source," (2) the opinion must be a "medical opinion," (3) the opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques[,]" and

---

[3] "Treating source" is defined as the claimant's "own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 416.927(a)(2).

[4] The Court acknowledges that certain Social Security Rulings, including SSR 96-2p, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Ms. Torrez's claim was filed in 2015, making the rescinded rulings and case law interpreting them still applicable.

(4) the opinion is "not inconsistent" with the other evidence of record, and explaining that "when all of the factors are satisfied, the adjudicator *must* adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion" (emphasis added)).

The "treating source" rule "recognizes the deference to which a treating source's medical opinions should be entitled." SSR 96-2p, 1996 WL 374188, at * 1. Such deference is warranted because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. § 416.927(c)(2). The Social Security Administration is not "permit[ted] to substitute [its] own judgment for the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." SSR 96-2p, 1996 WL 374188, at * 1.

When the record contains opinions from a treating source, the weighing of medical opinions proceeds through a sequential process: the ALJ must first determine whether the treating source's opinions are entitled to controlling weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (describing the analysis as "sequential" and explaining that "[i]n deciding how much weight to give a treating source, an ALJ must first determine whether the opinion qualifies for 'controlling weight'"). SSR 96-2p "contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight." *Watkins*, 350 F.3d at 1300. "A finding at this stage (as to whether the opinion is either unsupported or inconsistent with other substantial

evidence) is necessary so that [the reviewing court] can properly review the ALJ's determination on appeal." *Id.* If the opinion is entitled to controlling weight, "no other factors need be considered and the inquiry is at an end." *Anderson v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished).[5]

However, even if not entitled to controlling weight, a treating source's medical opinion "is still entitled to deference and must be weighed using all of the relevant factors." *Langley*, 373 F.3d at 1120 (alteration and internal quotation marks omitted); *see Andersen*, 319 F. App'x at 718 (stating that if either condition entitling an opinion to controlling weight is not met, "an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt"). "[I]f the ALJ rejects [a treating source's] opinion completely, he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (internal quotation marks omitted). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson* 366 F.3d at 1082 (internal quotation marks omitted). An ALJ commits reversible error when she fails to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and to demonstrate that she has applied the correct legal standards in evaluating the evidence. *See Reyes*, 845 F.2d at 244; *Andersen*, 319 F. App'x at 717 ("The agency's failure to apply correct legal standards, or show us it has done so, is grounds for reversal." (alteration and internal quotation marks omitted)).

> **2. The ALJ erred in considering Dr. Laughter's treating-source opinions, and the reasons she gave for according "little weight" to his opinions are legally inadequate.**

---

[5] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

The ALJ's decision fails to evince compliance with the foregoing standards for weighing a treating source's opinions. Initially, it cannot be disputed that Dr. Laughter qualifies as a "treating source." The medical records establish that Dr. Laughter has had an ongoing treatment relationship with Ms. Torrez since 2006. He is intimately familiar with Ms. Torrez's mental conditions and testified that he "know[s] all of her patterns." He not only manages Ms. Torrez's medications but also provides psychotherapeutic counseling to help her manage her symptoms, which was particularly important during the period she was pregnant and breastfeeding and, therefore, not taking psychotropic medications. There can be little doubt that, on the record in this case, Dr. Laughter was in a unique position to provide a "longitudinal picture" of Ms. Torrez's mental impairments and related functional limitations.

Despite this, and despite the ALJ's recognition of Dr. Laughter as Ms. Torrez's "treating psychiatrist" (AR 049), the ALJ failed to perform a threshold controlling-weight analysis of Dr. Laughter's treating-source opinions. Absent from her decision is any indication that she considered whether Dr. Laughter's opinions were "well-supported" by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with the other substantial evidence of record. Indeed, her statement that she gave "little weight to Dr. [Laughter's] opinions" because "they are not consistent with or supported by the record as a whole"—coupled with the specific reasons she gave for discounting his opinions—evinces her application of an *incorrect* legal standard for considering the evidence of record and weighing Dr. Laughter's treating-source opinions.

The correct standard for determining, as a threshold issue, whether Dr. Laughter's opinions were entitled to controlling weight is not whether his opinions were "consistent" with the substantial evidence of record but rather whether they were "*not in*consistent." *See* 20 C.F.R.

14

§ 416.927(c)(2) (emphasis added). "Not inconsistent" is "a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other *substantial evidence* in the case record that contradicts or conflicts with the opinion." SSR 96-2p, 1996 WL 374188, at * 3 (emphasis added). In other words, Dr. Laughter's opinions could have been "inconsistent" with other evidence and still entitled to controlling weight, so long as his opinions were not contradicted by other *substantial* evidence of record. Not only did the ALJ fail to identify with specificity substantial evidence that contradicts any of Dr. Laughter's opinions but also the evidence the ALJ cited as a basis for discounting Dr. Laughter's opinions is plainly insufficient to support her conclusion that Dr. Laughter's opinions were "not consistent with or supported by the record as a whole[.]" The Court addresses each of the ALJ's proffered reasons for discounting Dr. Laughter's opinions in turn.

### a. Dr. Laughter's treatment records "showing intact memory and concentration"

According to the ALJ's summary of the evidence, Dr. Laughter's treatment records—specifically his documentation of the results of Ms. Torrez's mental status examinations—"showed normal thought process and content (including no suicidal ideation) as well as intact recent and remote memories and attention and concentration" on numerous occasions. (AR 051-52). This description is only partially accurate and conveys only a partial picture of what Dr. Laughter's treatment records show. Moreover, the ALJ failed to explain how the cited evidence supports her conclusion that *all* of Dr. Laughter's opinions were "not consistent with or supported by the record as a whole[.]" As the Court explains, the record—properly considered as a whole—does not support the ALJ's discounting of Dr. Laughter's opinions on this first proffered basis.

Each of Dr. Laughter's treatment records contains a section called "Exam" in which Dr. Laughter recorded, on a table, the results of the mental status examination he performed at each session, i.e., his impressions of Ms. Torrez's appearance, behavior, speech, mood, affect, thought process, thought content, insight/judgment, consciousness, orientation, recent memory, remote memory, attention/concentration, language (naming), language (repeating phrase), language (abstraction), and fund of knowledge based on her presentation and his observations upon examination. Dr. Laughter consistently documented generally unremarkable findings regarding Ms. Torrez's thought process and content, indicating Ms. Torrez's "Goal Directed, Organized, Logical, Linear" thought process and that she was "Future Oriented" with no indications of suicidal or homicidal ideations and "No Abnormal [thought] Content." Importantly however, Dr. Laughter also consistently noted that Ms. Torrez's mood was "Sad/Depressed, Anxious, Irritable" and described her affect as "Mood Congruent, Restricted Range, Fearful/Anxious, Sad/Depressed." He treated her with psychotropic medications and medical cannabis to help manage her bipolar, PTSD, and anxiety symptoms, which included "up and down" moods, self-esteem, energy levels, and concentration, as well as irritability, anger, depression, and anxiety. He counseled her on a regular and ongoing basis—including during the period when she was breastfeeding and declined medications—regarding everything from her evolving relationship with her daughter's father (e.g., going through paternity testing, meeting his fiancée, and trying to obtain child support) to the challenges of being a single parent, experiencing financial struggles, and her unsuccessful attempts to keep a job. His counseling focused on helping Ms. Torrez "increase insight and understanding," improve her communications and coping skills, and reduce her symptoms by identifying the sources of her feelings. He noted that in the time he has known her, she has been unable to keep a job or live independently, which he attributes to the mood instability caused by her conditions. He

acknowledged that there are times when she is in a "well state" but explained that "she can turn on a dime" because of her PTSD. (AR 1379.) Finally, he made clear that his opinions regarding her functional limitations remained unchanged despite that she had been back on medication for 4-5 months because she "remains very symptomatic" and continues to be "unstable." (AR 1379, 1383, 1384.)

Although the Court acknowledges that the ALJ's decision indeed mentions some of the foregoing evidence that tends to undercut her finding of inconsistency, the ALJ's regurgitative summaries—which are unsupported by logical explanations connecting the evidence cited to her finding that Dr. Laughter's opinions are not consistent with or supported by his treatment records—are plainly insufficient to support her rejection of Dr. Laughter's opinions. For example, the ALJ failed to explain—and the Court fails to see—how evidence indicating that Ms. Torrez presented as goal-directed in her thinking and non-suicidal is somehow inconsistent with and undermines Dr. Laughter's opinion that Ms. Torrez has a *marked* limitation in being able to accept instructions and respond appropriately to criticism from supervisors. Or how evidence that Ms. Torrez's attention and concentration were considered "Intact" upon brief mental status examination in a clinical setting invalidates Dr. Laughter's opinion that Ms. Torrez would have a *marked* limitation in her ability to maintain attention and concentration for "extended periods of time"—meaning in two-hour segments—on a sustained basis in a work setting. Particularly on this record, it was not enough for the ALJ to baldly conclude that certain cherrypicked and decontextualized portions of Dr. Laughter's comprehensive treatment records justified her accordance of "little weight" to Dr. Laughter's opinions and her commensurate rejection of the mental limitations he found.

### b. Ms. Torrez's "non-compliance with mental health treatment"

The next reason the ALJ gave for discounting Dr. Laughter's opinions is that she found that Ms. Torrez was "non-complian[t] with mental health treatment (including failure to pursue psychotherapy)[.]" (AR 050.) While not entirely clear, the ALJ appears to have based her finding of treatment "noncompliance" on two things: (1) that Ms. Torrez did not pursue "individual therapy," and (2) that Ms. Torrez did not take her medications as prescribed by Dr. Laughter while she was breastfeeding. It is true that "[t]he failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996). However, the record does not support the ALJ's finding that Ms. Torrez was noncompliant with prescribed treatment.

The only evidence the ALJ cited that even arguably supports her finding that Ms. Torrez "fail[ed] to pursue psychotherapy" is (1) in June 2016, "Dr. Laughter suggested that individual therapy would be good for her but Ms. Torrez reported that she did not have the time due to having a young child and helping take care of her parent" (AR 051; *see* AR 1118, 1122), and (2) in March 2018, "Ms. Torrez indicated that she will consider individual therapy when time permits" (AR 052; *see* AR 1322, 1325). Setting aside that the ALJ failed to explain how Ms. Torrez's "failure" to pursue *suggested* "individual therapy" rendered Dr. Laughter's findings "not consistent with or supported by the record as a whole," there is a more basic problem with the ALJ's reasoning: it ignores the fact that Ms. Torrez was, in fact, engaged in psychotherapy on a regular and ongoing basis, i.e., the ALJ's finding is not supported by substantial evidence.

As previously noted, Dr. Laughter provided Ms. Torrez with psychotherapeutic counseling at each of her appointments. His records indicate that he regularly spent greater than half of each session providing counseling and/or coordination of care, i.e., psychotherapy. (*See* AR 1091, 1096, 1101, 1106, 1111, 1116, 1122, 1126, 1132, 1137, 1141, 1148, 1250, 1256, 1261, 1266, 1271, 1276,

1281, 1286, 1291, 1295, 1310, 1320, 1325.) Each of Dr. Laughter's treatment records contains a one- or two-paragraph narrative summary under the heading "Psychotherapy" in which he both summarized the psychosocial issues Ms. Torrez discussed at each session and recorded the supportive and problem-solving therapeutic counseling he offered in turn. Except for a few longer stretches between sessions, Ms. Torrez consistently saw Dr. Laughter and engaged in psychotherapy on a monthly basis beginning in 2014 and continuing through the date of her administrative hearing. Thus, the ALJ's finding that Ms. Torrez was noncompliant with treatment because she "fail[ed] to pursue psychotherapy" is flatly contradicted by the record.

The other basis on which the ALJ appears to have relied to find that Ms. Torrez was noncompliant with treatment is that Ms. Torrez did not take her psychotropic medications as prescribed. While the ALJ acknowledged that Dr. Laughter testified that Ms. Torrez "has been compliant with taking medications," she found that his testimony "is contradicted by his treatment records[.]" (AR 050.) According to the ALJ, Dr. Laughter's December 2015 treatment record indicated that Ms. Torrez "was prescribed Zoloft and [D]epakote but she admitted she had not been taking her medications because she was breast feeding." (AR 051.) This not only mischaracterizes Dr. Laughter's treatment record but also further evinces the ALJ's incomplete consideration of the evidence of record.

The substantial evidence of record establishes that Dr. Laughter did not begin prescribing—and Ms. Torrez therefore did not begin taking—psychotropic medications again until June 2016. (AR 1228.) Beginning in December 2014, Ms. Torrez affirmatively declined medications because she was breastfeeding. (AR 1143.) Dr. Laughter's treatment records throughout 2015 and during the first half of 2016 indicate that he was not prescribing psychotropic medications "due to patient breast-feeding." (AR 1167, 1172, 1177, 1182, 1187, 1192, 1203, 1208,

1213, 1218, 1223.) In February 2015, Dr. Laughter noted, "it would be good to hold off" on psychotropic medications "due to breast-feeding[.]" (AR 1167.) When Ms. Torrez acknowledged in August 2015 that she "does better on medications" but continued to express reservations about restarting medications due to breastfeeding, Dr. Laughter counseled her regarding the risks and benefits of taking medications but continued to respect her preference not to restart medication and agreed to revisit the issue in the future. (AR 1177.) Dr. Laughter's October and November 2015 treatment notes make clear that Ms. Torrez continued to decline medication due to breastfeeding and that Dr. Laughter continued to indicate "[n]o psychotropics at this time. Reassess after breast-feeding." (AR 1182-83, 1187, 1189.)

Regarding Dr. Laughter's December 2015 treatment record, the Court acknowledges that it lists "Zoloft" and "Depakote" in the "Meds" section of the record. (AR 1128.) However, when properly considered alongside the substantial evidence of record, these notations—which also appeared in each of Dr. Laughter's treatment records beginning in August 2014[6] (AR 1143, 1150, 1167, 1172, 1177, 1182, 1187)—do not support the ALJ's finding that as of December 2015, Ms. Torrez had been "prescribed Zoloft and [D]epakote[.]" (AR 051.) Dr. Laughter's December 2015 treatment record in fact notes that Ms. Torrez "remains unable to start medications due to breast-feeding" and provides that her treatment plan continued to include "[n]o psychotropics at this time. Reassess after breast-feeding." (AR 1128, 1130.) Moreover, the ALJ's finding that Ms. Torrez "*admitted* she had not been taking *her* medications because she was breast feeding" (AR 051 (emphases added)) grossly mischaracterizes the evidence. In December 2015, Dr. Laughter noted,

---

[6] It is unclear why these notations appear in Dr. Laughter's treatment records, particularly given that Dr. Laughter expressly noted in his August 2014 treatment notes, "No medications at this time due to 5 months pregnant" and "No psychotropics at this time due to patient 5 months pregnant." (AR 1150, 1151.) Although the Court acknowledges this seeming inconsistency in the evidence, the ALJ was not free to ignore the other substantial evidence of record—all of which corroborates that Ms. Torrez was *not* taking medications in 2015 or early 2016 (*see, e.g.*, AR 110, 322, 515)— and rely on this inconsistency to support her rejection of Dr. Laughter's opinions.

as he consistently had since August 2014, that "[t]he patient hasn't been on medications due to breast feeding." (AR 1128.) Properly construed based on the record as a whole, this statement supports a finding that Ms. Torrez was *not* taking medication as of December 2015 because it was *not* part of her treatment plan, i.e., that Ms. Torrez was compliant with treatment by not taking medications that had not been prescribed. It does *not* support the ALJ's contrary finding that Ms. Torrez "had not been taking her medications" and was, therefore, noncompliant with treatment.

The only other evidence the ALJ cited that even arguably reflects on Ms. Torrez's medication compliance is Dr. Laughter's December 2017 treatment record, which the ALJ summarized, in pertinent part, as follows: "She was taking lithium and Klonopin as needed. She did not want to take medications on a regular basis due to breast feeding." (AR 052.) The ALJ offered no other explanation of the significance of this evidence, either standing alone or, critically, vis-à-vis the other evidence of record. Notably, the record is clear that when Ms. Torrez resumed medication therapy in June 2016 and continuing through 2017, she consistently reported to Dr. Laughter that she was taking her medications on an as-needed basis, rather than daily or twice daily as prescribed, because she continued to breastfeed. (*See, e.g.*, AR 1088, 1093, 1098, 1297.) Despite this, Dr. Laughter never described Ms. Torrez as being noncompliant with treatment[7] and, in fact, consistently indicated "[n]o concerns" regarding Ms. Torrez's medication adherence.[8] (AR

---

[7] The Court acknowledges that on one occasion, Dr. Laughter noted that the fact that Ms. Torrez was still breastfeeding "has been holding her back from being fully compliant with medications." (AR 1093.) However, properly viewed in light of the record as a whole, this statement, which the ALJ did not cite, is insufficient to support either the ALJ's finding that Ms. Torrez was "non-compliant" with treatment or her finding that Dr. Laughter's opinion that Ms. Torrez was compliant with medications was contradicted by his treatment records.

[8] Dr. Laughter's treatment form uses the term "Adherence" rather than "compliance." "Adherence" in the medical context—specifically as used in the treatment of chronic psychiatric disorders—describes "'the extent to which a person's behaviour, taking medication, following a diet, and/or executing lifestyle changes, corresponds with agreed recommendations from a health care provider'." Subho Chakrabarti, *What's in a name? Compliance, adherence and concordance in chronic psychiatric disorders*, World J. Psychiatry, 2014 Jun. 22, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4087153/. The term "adherence" has come into use as a replacement for "compliance," which is considered a "dichotomous" and "clinician-centered term[.]" *Id.* By contrast, "[t]he concept of adherence places emphasis on a process, in which the appropriate treatment is decided after discussion

21

1235, 1241, 1249, 1255, 1260, 1265, 1270, 1275, 1280, 1285, 1290, 1294, 1299, 1304, 1309, 1314, 1319, 1324, 1334.) On this record, the ALJ was not free to substitute her opinion for Dr. Laughter's regarding whether Ms. Torrez was compliant with the treatment plan that Dr. Laughter developed in consultation with Ms. Torrez.

### c.  Ms. Torrez's "good response to medication and therapy when she is compliant"

The ALJ's third proffered basis for discounting Dr. Laughter's opinions was that she found the limitations he assessed "not consistent with or supported by" evidence indicating that Ms. Torrez had a "good response to medication and therapy when she is compliant[.]" (AR 050.) According to the ALJ, Dr. Laughter's treatment records indicated that Ms. Torrez "had good results with supportive therapy." (AR 051, 052.) The ALJ specifically cited three of Dr. Laughter's treatment records—December 22, 2015, June 28, 2016, and March 13, 2018—in which Dr. Laughter indeed noted in the "Psychotherapy" section of his notes, "Good results with supportive therapy." (Id.; see AR 1122, 1132, 1325.) The ALJ also found that in March 2018—i.e., when Ms. Torrez was taking her medications daily—Ms. Torrez "had an impression of stabilizing bipolar, episodic PTSD, and situational anxiety with some generalized anxiety," which, according to the ALJ, "reflects positive response to medication." (AR 052.)

Even assuming the evidence the ALJ cited tends to suggest that Ms. Torrez generally had a positive response to treatment, the Court fails to see—and the ALJ failed to explain—how it contradicts and supports the ALJ's rejection of Dr. Laughter's specific opinions regarding Ms. Torrez's work-related mental functional limitations. As previously noted, Dr. Laughter testified

between the prescriber and the patient. It implies that the patient is under no compulsion to accept a particular treatment, and shall not be held responsible for the failure of a treatment plan because of non-adherence[.]" Id. What is clear from Dr. Laughter's treatment records, coupled with his deposition testimony, is that he considered Ms. Torrez a "medical decision maker" (see AR 1138) and did not consider her medication-related choices—i.e., to either not take medication while breastfeeding or take it only as-needed while weening—to constitute nonadherence, much less noncompliance, with treatment.

that even when Ms. Torrez was medication compliant, she was still "very symptomatic" and "unstable." (AR 1379, 1384.) While he indicated that the goal for someone like Ms. Torrez is to "reduce the symptoms" and that keeping symptoms low "*can* be done by medications and counseling and other means" (AR 1384 (emphasis added)), he never suggested that Ms. Torrez had, in fact, ever achieved that goal, even temporarily. Indeed, he specifically testified that in his twelve years of treating Ms. Torrez, he had "seen her in all sorts of states, and it[']s never stable. That's the whole thing about her. She's never stable for long periods of time." (AR 1383.)

Moreover, the ALJ's finding that in March 2018, Ms. Torrez "had an impression of stabilizing bipolar, episodic PTSD, and situational anxiety with some generalized anxiety, which reflects positive response to medication" mischaracterizes the evidence. Ms. Torrez in fact reported that she felt that her medications were not helping and that she continued to feel "'[u]p and down, irritable, depressed, anxious, angry, and emotionless.'" (AR 1322.) Dr. Laughter noted that Ms. Torrez presented as sad/depressed, anxious, and irritable and that she "remains in mixed bipolar episode" with symptoms of "mood instability, racing thoughts, poor concentration, poor sleep." (AR 1323-24.) He also noted, "PTSD is episodic: mood instability, flashbacks, nightmares, reaction to triggers, hyper-vigilant." (AR 1323.) Based on Ms. Torrez's presentation and her ongoing complaints of "mood instability and anxiety[,]" Dr. Laughter increased the dosages of all three of the medications Ms. Torrez was taking at the time: Lamictal, Abilify, and Ativan. (*Id.*)

On this record, the fact that Dr. Laughter indicated that Ms. Torrez had a "[g]ood response to supportive therapy" and that Ms. Torrez was, at best, starting to respond to medication in March 2018 does not support the ALJ's finding that Dr. Laughter's opinions indicating *marked* and *moderate* limitations were not consistent with or supported by the record. Thus, the ALJ's third reason for discounting Dr. Laughter's opinions is also inadequate.

d. **Ms. Torrez's "daily activities, including the ability to care for her child and her parents"**

The final reason the ALJ gave for according "little weight" to Dr. Laughter's opinions is that she found his opinions "not consistent with or supported by" Ms. Torrez's "daily activities, including the ability to care for her child and her parents." (AR 050.) The ALJ noted that Ms. Torrez described herself as a "stay-at-home mother" who "spends most of her time taking care of her daughter" and who also "makes sure her dad is fed and that he takes his medications." (*Id.*) She further noted that Ms. Torrez reported being able to drive, go grocery shopping, attend church, take her daughter to the park, exercise by going for walks, and do household chores, including make breakfast, feed the animals, wash laundry, do dishes, and vacuum. (AR 052-53.)

The record supports the ALJ's findings regarding what Ms. Torrez's activities of daily living are. However, the ALJ's decision fails to explain how the evidence reflecting Ms. Torrez's daily activities somehow contradicts Dr. Laughter's opinions regarding Ms. Torrez's work-related mental functional limitations.

The uncontroverted evidence of record makes clear that Ms. Torrez's mental impairments principally manifest as mood instability, which affects her ability to interact appropriately with others, particularly people with whom she is less familiar and whom she feels "don't understand" her and what her limitations are. (AR 077, 083.) Ms. Torrez testified that when she interacts with others, she "tend[s] to snap verbally" (AR 076) and gave two examples of being fired from different jobs because of verbal snapping, once at a manager and once at a customer. (AR 085-86.) Dr. Laughter expressed concerns about Ms. Torrez's ability to interact with clients, coworkers, and supervisors because of her mental impairments and based on Ms. Torrez's reported history of "temper problems" and being unable to keep a job. (AR 1137, 1288, 1379.) He specifically indicated that he would expect "verbal altercations"—and possibly even physical altercations—as

a result of "pressures" at work that he opined would throw Ms. Torrez off "sooner than later." (AR 1379.) Commensurately, he opined that Ms. Torrez would have *marked* limitations in her ability to (1) interact appropriately with the general public, (2) accept instructions and respond appropriately to criticism from supervisors, and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 1086.)

None of the evidence regarding Ms. Torrez's daily activities that the ALJ cited supports the ALJ's rejection of Dr. Laughter's opinions regarding Ms. Torrez's mental functional limitations, particularly his findings regarding her social interaction limitations. Notably, the ALJ acknowledged that with respect to those of Ms. Torrez's daily activities that involve any degree of social interaction, the evidence indicated that Ms. Torrez did them only with restrictions and limitations. The ALJ noted that Ms. Torrez indicated that "it is difficult for her to go to Wal-Mart with 'all those people'" and that she "tries to limit her stay in a store to one hour"; that when she takes her daughter to the park, she only invites friends with small children to meet them "[i]f she is in a good state"; and that when she attends church, she "does not interact with people there." (AR 052-53.) In other words, the ALJ's own description of the evidence regarding Ms. Torrez's daily activities tends to support and be consistent with—not contradict—Dr. Laughter's opinions regarding Ms. Torrez's social interaction limitations.

In sum, the reasons the ALJ gave for discounting Dr. Laughter's opinions—reasons that (1) are premised on mischaracterizations and/or substantively deficient consideration of the evidence, and (2) are conclusory and unexplained—are legally inadequate. The ALJ's decision generally fails to demonstrate that she applied the correct legal standards for considering the evidence of record, in general, and for weighing Dr. Laughter's treating source opinions, in particular. As such, her decision must be reversed and remanded.

**e.  The Court Does Not Reach Ms. Torrez's Other Arguments**

Because the Court concludes that remand is required as set forth above, the Court will not address Ms. Torrez's remaining claims of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Ms. Torrez's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 21) is GRANTED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent